## PEOPLE v. DORIS.

(Supreme Court, Appellate Division, First Department. February 5, 1897.)

OBSCENITY—INDECENT PANTOMIME.

It is an offense against public decency (Pen. Code, § 385) to exhibit a pantomime showing a bridal couple in a bedroom on the night of their marriage; the departure of the groom to enable the bride to undress, which she then does, though without exposing much of her person; her turning down of the light and getting into bed, followed by a knock at the door announcing the return of the groom, who is bidden to enter, whereupon the curtain falls.

Appeal from court of special sessions, New York county.

John B. Doris was convicted of maintaining a public nuisance, and appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Ira Leo Bamberger, for appellant.
John D. Lindsay, for respondent.

BARRETT, J. The defendant was convicted, under section 385 of the Penal Code, of the misdemeanor of maintaining a public nuisance. The nuisance consisted of the public performance in a theater in this city of a pantomime called "Orange Blossoms," which, as the information charged, was offensive to public decency. Neither the specifications upon which the charge rested, nor the proofs in support of the information, need be stated in detail. They may, with great propriety, be condemned, and any statement thereof limited to the facts essential to a proper understanding of the questions presented for decision. The pantomime commences with the scenic representation of a bedchamber, to which a bride and bridegroom resort late upon the night of their wedding day. They are accompanied by the bride's parents. After the

clock strikes 12, the parents depart, and the young couple are left alone. The husband then falls on his knees before his wife. She raises him up, and, as she complains of a headache, he takes her to the bed, and suggests that she lie down. She requests him to leave the room. He refuses, declaring that they are married. She insists,. however, and takes him to the door. There he puts his hand up to indicate that he will be back in five minutes, and then he goes out. The woman.then proceeds to undress herself completely, and to put on her nightgown. She apparently removes even her slippers, garters, and stockings. In removing her clothing, however, she dexterously limits the exposure of her person. When she is entirely prepared to retire, she gets into bed and turns down the light. At that moment, there is a knock at the door, and she says, "Entrez." Upon this, the curtain falls. The word "entrez" is the only word spoken throughout. The rest is dumb show. It is apparent that the one all-pervading feature of this performance is its suggestiveness. Take that away, and nothing is left; that is, nothing which would. be in the least likely to draw an audience. The story told would then become vapid and meaningless. What the representation essentially suggests'is indecency. It is permeated with that character throughout. To suggest that is its single idea and purpose. It is that which it presents to the eye, the mind, and the imagination. The picture is unmistakable. Plot and action unite to color and emphasize it.

It is well settled that whatever outrages public decency and is injurious to public morals is indictable. This general subject was fully discussed in People v. Muller, 96 N. Y. 408, and the test of criminality·was there carefully stated. That test is whether the picture presented to the eye "is naturally calculated to excite in a spectator impure imagination, and whether the other incidents and qualities, however attractive, were merely accessory to this, as the primary or main purpose of the representation." Substantially the same test was applied in Reg. v. Hicklin, L. R. 3 Q. B. 369, namely, whether the tendency of the matter charged is to deprave or corrupt those whose minds are open to such immoral influences, and who might come in contact with it. "The question in all these cases," said Mr. Justice Daniels in the Muller Case (at general term) 32 Hun, 209, "must be, what is the impression produced upon the mind by perusing or observing the writing or picture referred to in the indictment?" The present case clearly comes within the principle thus enunciated.

It remains but to consider briefly two positions taken upon behalf of the defendant. The first is that public decency was not offended, because the actress who played the part of the bride exposed but little of her person. Second, that the suggestiveness of the exhibition was connected with lawful marriage, and not with illicit relations. As to the first position, we need only say that the test to which reference has been made embraces any picture which tends to deprave and corrupt the morals of those whose minds are open to such influences, and that, in applying this test, regard is always had to the idea conveyed. U. S. v. Bennett, 16 Blatchf. 362,

Fed. Cas. No. 14,571, and cases already cited.   Such a performance as that under consideration is really more dangerous to public morals than any mere vulgar exhibition of nudity.   The latter may arouse impure thoughts, but it is more apt to excite disgust. The greater danger lies in an appeal to the imagination; and, when the suggestion is immoral, the more that is left to the imagination the more subtle and seductive the influence.   The appellant's second position is somewhat startling.   Its logic would justify an advance into even a grosser domain than that of suggestiveness.   According to this view, no public display of any form or expression of marital intimacy could be held to be indecent.   The proposition is preposterous.   The picture is none the less licentious because it is painted upon a clean canvas.   The aim here was not to honor, but to degrade, marriage; and the defendant's guilt is enhanced, not diminished, by his utilization of its sacred confidences to serve his criminal purpose.

The judgment should be affirmed.   All concur.

---

### In re CLUTE.

(Supreme Court, Appellate Division, First Department.   February 5, 1897.)

1. ASSIGNMENT FOR CREDITORS—EMPLOYMENT OF ASSIGNEE'S LAW FIRM.

Notwithstanding an agreement, made at first meeting of creditors, that the' assignee's law firm might be retained for him, and paid reasonable fees, in consideration of his waiving fees as assignee, the rule that an assignee cannot retain his firm is properly followed; allowance, however, being made of fees to the assignee, as such, on objection to allowance of attorney's fees to the firm by creditors not present at such meeting, and who, though knowing the firm was performing the service, did not ratify the agreement, or estop themselves.

2. SAME—DEFENDING ACTION AGAINST ASSIGNOR.

An assignee should be allowed reasonable attorney's fees paid for defending an action against the assignor, brought after making the assignment; the assignor being without funds, the claim being denied by him, and the services being beneficial to the estate.

Appeal from special term, New York county.

